**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

Caleb Lapierre,

　　　　　　　　Plaintiff,

v.

Orion House, Inc.,

　　　　　　　　Defendant.

Civil Action No. _____

**COMPLAINT**
**(With Jury Demand)**

NOW COMES the plaintiff, Caleb Lapierre ("Plaintiff"), by and through counsel, Nixon Peabody LLP, and respectfully submits the following Complaint, stating in support thereof as follows:

**NATURE OF ACTION**

1.　　　Plaintiff is a child abuse survivor who endured physical and sexual assaults after being taken from the care and custody of his parents by the State of New Hampshire[1] and confined to a privately-run, 24-hour residential child care facility operated by Defendant Orion House, Inc. ("Defendant" or "Orion House"). Orion House owed fiduciary and common law duties to create a safe environment for children and to protect the children entrusted to its care, including Plaintiff, from harm. In violation of those duties, Orion House instead created an environment that allowed its employees to prey on vulnerable children, including Plaintiff, with impunity. As a result, Mr.

---

[1] Plaintiff has fully released and discharged all claims and causes of action against the State of New Hampshire pertaining to his placement at the facility operated by Orion House, pursuant to a previous settlement agreement.

Lapierre was injured and has suffered damages in excess of the jurisdictional thresholds of this court.

## PARTIES

2.      Plaintiff is an individual resident of the Commonwealth of Massachusetts with an address of 30 Electric Avenue, Lunenberg, MA 01462.

3.      Defendant is a nonprofit corporation incorporated under New Hampshire law with a principal place of business at 139 Elm Street, Newport, New Hampshire, 03773.

4.      The State of New Hampshire is a settled non-party herein.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

6.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in the state in which this District is located, and the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### Background Facts Regarding Children Taken into State Custody

7.      Since at least the 19th century, the State of New Hampshire has been taking custody of vulnerable children and children in need of protection or services pursuant to its *parens patriae* powers. Those powers arise from two fundamental principles: first, that the State has inherent authority to intervene in a child's life in appropriate circumstances, such as when the child's parents are deficient or the child otherwise needs protection or support; and second, that once the State has intervened, it thrusts upon itself the duties of a "super parent" or a "higher parent" of the child. *See generally*, Esther K. Hong, *A Reexamination of the Parens Patriae Power*, 88 Tenn. L.

Rev. 277, 283-286 (2021). Indeed, New Hampshire's Office of the Child Advocate has recognized the heightened duty of protection the State bears when it institutionalizes children:

> When children are removed from their home and community for whatever reason, it falls to the State child welfare system to ensure safety and well-being at an even higher standard than parents would be expected to provide, because just leaving home sets a child back in the trajectory of development. Children placed in institutional settings are hidden from community view. Children who are institutionalized have the highest risk of being [abused].

Office of the Child Advocate, *System Review 2019-01, Restraining and Secluding Children* (Jan. 9, 2020), *available at* https://mm.nh.gov/files/uploads/childadvocate/documents/oca-restraint-seclusion-review-2020-1-8.pdf.

8.      Under New Hampshire's modern statutory regime, which largely adopts these foundational principles of the *parens patriae* doctrine, the State takes custody of delinquent children (RSA Chapter 169-B, "Delinquent Children"); abused, neglected, or abandoned children (RSA Chapter 169-C, "Child Protection Act"); and children in need of services (RSA Chapter 169D, "Children in Need of Services") (these three chapters of the RSA are collectively referred to hereinafter as "the Child Welfare Acts") in order to protect, rehabilitate, and treat them. While the Child Welfare Acts were enacted in 1979, the antecedents to these statutes, which shared likeminded policies and purposes, existed at least as far back as 1937.

9.      The Child Welfare Acts define custody as "a legal status created by court order wherein the department of health and human services has placement and care responsibility for the minor." RSA 169-B:2, III-a.; RSA 169-D:2, V. In taking such custody of minors, the State accepts certain fiduciary duties, both implied and express, including those specifically set forth in the Child Welfare Acts. As reflected in the Child Welfare Acts, and as has been the policy of the State of New Hampshire long before the modern Child Welfare Acts were enacted, the purpose of the State

3

taking custody of at-risk children is the care, protection, and rehabilitation of such children who have come into the juvenile justice system because of adverse childhood experiences, parental abuse or neglect, or other trauma or crisis. In accepting custody and making these placements, the State removes these children from the physical custody and care of their parents, family members, or legal guardians and entrusts them to the custody and care of state agencies who assume the duties of a "super parent" to care for, supervise, and protect them, to the exclusion of others.

10.     Since at least 1858, the State of New Hampshire has operated certain secure residential facilities for the purpose of discharging its duties to shelter, care for, protect, educate, and rehabilitate at-risk children. As an alternative to placement at a state-operated facility, the State of New Hampshire has at times placed children at any one of a number of privately-operated facilities that provide similar services on behalf of the State.

11.     The State of New Hampshire contracts with (and historically has contracted with) several private third-party providers of congregate care services—secure residential treatment facilities that usually consist of 24-hour-a-day supervision in a highly structured and restricted setting. The State of New Hampshire often uses placements with these privately-operated congregate care providers (hereinafter, "State Contractors") as an alternative to placement in one of the State-operated facilities. The State retains legal custody and control of the children it places with State Contractors. The State Contractors perform their services on behalf of the State and as agents of the State.

12.     The State of New Hampshire has passed a myriad of laws relating to the operation of State Contractors. Since at least 1984, State Contractors have been subject to licensing rules under RSA Chapter 170-E and Chapter He-C 4000 of the New Hampshire Administrative Rules. The duties and responsibilities of State Contractors licensed by the State of New Hampshire

4

include, *inter alia*, the duty of all employees and agents of a State Contractor who have reason to suspect that a juvenile resident is being abused or neglected to report such suspected abuse or neglect to the New Hampshire Division for Children, Youth and Families (N.H. Code R. He-C 4001.10), and the duty to "provide care and supervision at all times to ensure that residents are safe and that their needs are met according to their developmental level, age, emotional or behavioral needs," and to develop appropriate policies governing the conduct of employees and agents working with minor residents, including policies to address medical emergencies, physical and sexual assaults on residents, injuries to residents, reporting requirements applicable to such facilities, and the training and orientation of staff members who work with minor residents (N.H. Code R. He-C 4001.14). Additionally, RSA 170-E:27, II prohibits State Contractors from endangering the health, safety, or welfare of children entrusted to their care, and N.H. Code R. He-C 4011.22 prohibits State Contractors from abusing or neglecting residents, using corporal punishment upon residents, allowing residents to discipline other residents, using mechanical restraints or rough handling upon residents, or attempting to control residents' behavior through humiliating, threatening, shaming, frightening, or damaging actions.

13.    Since at least 2010, State Contractors have also been subject to RSA 126-U, which, *inter alia*, requires such facilities to have written policies and procedures for managing the behavior of children (RSA 126-U:2), prohibits such facilities from using or threatening to use "dangerous restraint techniques" (RSA 126-U:4), limits the use of restraints to emergencies only and prohibits the use of restraints as a punishment (RSA 126-U:5), establishes notice and record-keeping requirements whenever restraints have been used on a child (RSA 126-U:7), and establishes notice requirements whenever a child subject to a restraint has been seriously injured (RSA 126-U:10).

14. At all times relevant to the allegations herein, Defendant was among the State Contractors that provided congregate care services, on behalf of the State and as an agent of the State, to children under the custody and control of the State, to whom the State owed fiduciary and other duties. At all times relevant to the allegations herein, Defendant operated a residential and educational facility under the name Orion House.

15. While minors were and are committed to the custody and charge of the State of New Hampshire for a variety of reasons, the central purpose for these placements has always been protective, rehabilitative, therapeutic, and developmental, not penal. For example, RSA 169-B:1 states that the chapter governing delinquent children shall be "liberally interpreted, construed and administered to effectuate the following purposes and policies:"

> I. To encourage the wholesome moral, mental, emotional, and physical development of each minor coming within the provisions of this chapter, by providing the protection, care, treatment, counselling, supervision, and rehabilitative resources which such minor needs.

RSA 169-B:1. *See also* RSA 169-D:1; RSA 169-C:2.

### Facts Specific to Plaintiff's Experience at Orion House

16. Plaintiff was born in 1995. Plaintiff's biological father died in a motorcycle accident when Plaintiff was a baby, and Plaintiff's mother later said that she went into "deep grieving" following her husband's death and "probably wasn't as available to Caleb as I should have been." Approximately two to three years following the death of Plaintiff's father, his mother remarried, and Plaintiff's family grew to include two younger half-sisters, in addition to his older sister.

17. Growing up, adults described Plaintiff as "an extremely likeable and engaging kid," and he performed well academically, achieving honor roll before entering middle school.

However, Mr. Lapierre's mother and stepfather divorced in 2009, and Plaintiff was forced to change schools after his mother moved the family from New Durham to Alton. Thereafter, Plaintiff began to exhibit various behavioral issues and to get into trouble at school and elsewhere.

18.     The State of New Hampshire took Plaintiff into its custody and control and placed Plaintiff in Orion House's residential child care facility between December 1, 2011 and June 15, 2012. Plaintiff was 16 years old at the time of his placement.

19.     Upon information and belief, the State of New Hampshire contracted with Orion House to provide residential child care services to children in the State's legal custody.

20.     During Plaintiff's residence at Orion House, an adult staff member in a supervisory position, known to Plaintiff as Baylee Joyle Simpson-Allard (hereinafter, "Baylee"), repeatedly sexually abused and raped Plaintiff.  Baylee groomed, manipulated, and coerced Plaintiff, a juvenile, into engaging in sexual conduct and sexual intercourse on multiple occasions. In an environment where staff were routinely cruel and physically, verbally, and psychologically abusive toward minors, Baylee paid special attention to Plaintiff and showed him kindness, concern, and protection.

21.     Baylee exploited the trust and rapport she developed with Plaintiff to manipulate him for her own sexual gratification, using her power over Plaintiff to grant or withhold special privileges, such as home visits and access to cigarettes, depending on whether Plaintiff complied with her sexual advances.

22.     On numerous occasions, Baylee fondled and/or masturbated Plaintiff's genitals, performed oral sex upon Plaintiff, forced Plaintiff to engage in vaginal intercourse with her, and forced Plaintiff to digitally penetrate her vagina. Baylee's rapes and other sexual assaults of Plaintiff

occurred routinely during his placement at Orion House and occurred both on the premises of Orion House—including in Plaintiff's room and at other locations—and outside of the facility.

23.     Baylee would frequently use her position as a staff member, which included control over scheduling for other staff members, to isolate Plaintiff from other residents and staff, including by taking him off campus in vehicles owned by Defendant to sexually assault Plaintiff in secluded locations away from witnesses. Baylee even came to Plaintiff's home on multiple occasions during his home visits to sexually assault Plaintiff under the pretext of providing "supervision" while Plaintiff's mother was working night shifts.

24.     Even after Plaintiff's release from Orion House, Baylee continued to sexually harass and assault Plaintiff for over two months, threatening that she could arrange for Plaintiff's return to Orion House if he did not continue to comply with her sexual advances.

25.     Plaintiff has suffered lasting psychological and emotional trauma from the grooming and sexual abuse he experienced at Orion House.

26.     During his residence at Orion House, multiple staff members subjected Plaintiff to frequent physical, verbal, emotional, and psychological abuse resulting in permanent physical injuries to Plaintiff.

27.     Orion House staff members routinely forced residents, including Plaintiff, to resolve disputes or quarrels through "fight club" brawls and fistfights, resulting in physical injuries and emotional trauma. Staff members also frequently subjected Plaintiff to violent restraints, beatings, and verbal abuse. Multiple staff members would respond to perceived disobedience, misbehavior, or disrespect with violence and would kick, punch, or forcibly restrain Plaintiff upon the ground.

28.     One staff member, known to Plaintiff as "Dennis," was a Caucasian male, approximately 5'9" tall, with an average build, reddish hair, and a military-style haircut. Dennis frequently verbally and physically harassed Plaintiff, such as by telling him he was "fucking stupid" and hitting Plaintiff on the side or back of the head. Dennis would use minor pretexts, such as talking back or disobedience, to forcibly restrain Plaintiff and slam him to the ground, and Plaintiff was frequently temporarily unable to breath or had the breath knocked out of him when Dennis subjected Plaintiff to violent physical restraints. On multiple occasions, Dennis subjected Plaintiff to chokeholds and kicked Plaintiff in the side and abdomen while Plaintiff was physically restrained on the ground.

29.     Another staff member, known to Plaintiff as "Justin," was a Caucasian male in approximately his late twenties or early thirties, approximately 5'5" tall, with a muscular build and brown hair. Justin also frequently verbally and physically abused Plaintiff and subjected Plaintiff to violent restraints. On one occasion, Plaintiff made a joke at Justin's expense. Later that day, Justin retaliated by approaching Plaintiff while Plaintiff was lifting heavy weights. While Plaintiff was in a prone position lifting approximately 180 pounds over his body in a bench press, Justin pushed down on the barbell from above, forcing the weighted bar down against Plaintiff's neck. Justin held the barbell down against Plaintiff's throat, cutting off his ability to breathe. Justin then told Plaintiff that if Plaintiff ever made another joke at his (Justin's) expense or talked back to him, he would "snap your fucking neck." When Justin finally released the weight from Plaintiff's neck, Plaintiff coughed and vomited mucous, and his throat ached for several days afterward. This incident caused Plaintiff to fear for his life and safety and caused Plaintiff severe mental and emotional distress.

30.     A third staff member, known to Plaintiff as "Dan," was a heavyset Caucasian male, approximately 5'10" tall, who had a mustache and was bald on the top of his head but had a fringe of hair on the sides of his head. Like other Orion House staff members, Dan used perceived misbehavior, disobedience, or backtalk as a pretext to kick, hit, punch, and restrain Plaintiff. On one occasion, Plaintiff and other residents were outside playing in the snow following a snowstorm. The children were gathering snow into piles and then sledding down a hill to hit the piled snow and do jumps. Dan yelled at Plaintiff and the other children for doing jumps and told them to stop. Plaintiff disobeyed and continued to hit the jumps while sledding. Dan then yelled at Plaintiff to "get in the fucking house." While Plaintiff was walking in the door to the building, a staff member slammed him to the ground so hard that Plaintiff was knocked unconscious. Plaintiff believes that the staff member who slammed him to the ground was Dan, but Plaintiff cannot be certain whether it was Dan or another staff member. One moment, Plaintiff was walking through the door, and the next moment he awoke on the floor of the building with both his back and head in excruciating pain. Plaintiff was in so much pain that he had to crawl to a nearby chair to pull himself upright. Plaintiff approached a female staff member to request medical treatment, but Orion House staff were initially reluctant to bring Plaintiff to a hospital. Eventually, staff brought Plaintiff to the emergency room, where Plaintiff was diagnosed with and treated for a fracture of his spine. Plaintiff suffered severe and lasting pain from this injury.

31.     During his residence at Orion House, staff members also improperly medicated Plaintiff with antidepressants and other medications, leading to Plaintiff's addiction to and reliance upon prescription drugs.

**Defendant's Knowledge and Concealment of Abuse
and Plaintiff's Delayed Recognition**

32.    On information and belief, the abuse that Plaintiff suffered at Orion House was not unusual or isolated, and other child residents of Defendant's facility experienced similar abuse before, during, and after Plaintiff's period of detention there.

33.    On information and belief, multiple employees and agents of Defendant, including persons in positions with supervisory authority, knew or should have known of the inherent risk of child abuse at a congregate care facility where children are powerless to protect themselves and are subjected to the absolute control of the adults charged with their care. On information and belief, they also knew or should have known about the abusive proclivities of certain individual employees who worked with children at Orion House, and yet they not only failed to report this information as required by law or to take other corrective measures to protect the children who were placed there from reasonably foreseeable abuse, but they also concealed information regarding abuse at Orion House. As a result of the failures by employees and agents of Defendant, the abusers employed by Defendant were permitted to continue working with children in a custodial institution that was shielded from outside scrutiny, enabling them to continue to victimize children in their care and custody.

34.    On information and belief, the individual perpetrators of the abuse and the officers, directors, supervisors, employees, servants, or agents of Defendant, acted together, in a common plan or design, for the purpose of committing acts of physical, sexual, and emotional abuse and torture, and then acted together, in a common plan or design, to unlawfully and deliberately conceal those acts from discovery, including by telling the children that the acts were legitimate and "deserved" discipline, so that they could continue to perpetrate those acts on Plaintiff and on other minors in the custody and under the control of the State of New Hampshire.

35. The foregoing acts and omissions, including acts of fraudulent concealment, by agents and employees of Defendant constituted, among other things, endangering the welfare of a child, contrary to RSA 639:3, and criminal violations of RSA Chapter 642, Obstructing Governmental Operations.

36. When Plaintiff was a minor residing at Orion House, he did not understand, nor was he capable of understanding, that the foregoing incidents of abuse constituted legally cognizable injuries or that those injuries were caused by unprivileged, illegitimate, and wrongful acts or omissions of Defendant. As a child who was manipulated by the adults who exercised absolute control over every aspect of his life, Plaintiff was not capable of comprehending that he was being unlawfully abused or injured. Indeed, to Plaintiff, the abuse was a common and normal incident of life at Orion House. He was instructed that violent treatment was legitimate discipline for "kids like him" with "disciplinary issues" and that the conduct of staff was privileged and permitted. Plaintiff believed that, if the adults did it, and other adults allowed it, then it must be allowed.

37. Moreover, even to the extent that Plaintiff could comprehend that he was injured, he did not understand, nor could any child in such circumstances reasonably be expected to understand, that the abuse he suffered was caused not just by the intentional acts of individual perpetrators of the abuse, but also by Defendant's institutional failures.

38. At the time Plaintiff was released from Defendant's custody, as a child survivor of traumatic abuse, Plaintiff did not understand, and reasonably could not have understood, that Plaintiff had been harmed by Defendant as an entity. Further, Plaintiff did not understand, and reasonably could not have understood, that the abuse Plaintiff had suffered was caused by institutional negligence and malfeasance in addition to the intentional acts of the individual abusers; nor did Plaintiff

12

understand, and he reasonably could not have understood, that Plaintiff's abuse, and the fraudulent concealment of that abuse, was part of a coordinated effort in combination with deliberate indifference and widespread neglect by many employees and agents of Defendant.

39.    In fact, Plaintiff did not understand, until recently, that he was harmed not only by the intentional acts and omissions of individual abusers, but that the harm was caused by the institutional negligence and intentional malfeasance of Defendant. Not until approximately May of 2023 did it reasonably occur to Plaintiff that agents and employees of Defendant in positions of supervision and authority knew or reasonably should have known, directly or through employees or agents, that, without proper policies, protocols, training, enforcement, and oversight, abuse of children at Orion House was reasonably foreseeable; that, in fact, abuse of children had occurred at Orion House before and was likely to occur again; that, despite this actual or constructive knowledge of prior abuse and foreseeable risk of future abuse, these supervisors in positions of authority failed to take corrective action to protect Plaintiff from reasonably foreseeable abuse; and that these repeated institutional failures caused Plaintiff's injuries.

40.    Plaintiff's delayed appreciation that he was harmed by institutional failures is unsurprising. First, as alleged herein, Defendant, acting through its agents and employees, engaged in a conspiracy to conceal, cover up, and minimize the systemic child abuse perpetrated at the Defendant's facility. Additionally, as has now been recognized by a growing number of state legislatures and courts across the country, a victim's delayed recognition and disclosure of child abuse is the norm, not the exception. Many studies "have documented the psychological barriers to revealing the abuse and have shown that, typically, a survivor needs decades to process and understand the abuse." Marci A. Hamilton, *The Time Has Come for a Restatement of Child Sex Abuse*, 79 Brook L. Rev. 397, 400 (2014). "As a result, many [victims] do not tell others about the abuse

13

until their forties, fifties, or even later." *Id*; *see also* Andrew Ortiz, *Delayed Disclosure: Child USA 2024 Factsheet*, Child USA 1-3 (2024), *available at* https://childusa.org/wp-content/uploads/2025/11/Delayed-Disclosure-2024.pdf (describing how the disclosure of child sexual abuse "is a complex, lifelong process" that "often takes decades," with studies showing that the average length of time for a victim to come forward is "around 20 years," with even further delays for victims of "institutional abuse."). The New Hampshire legislature implicitly recognized this fact when it eliminated the statute of limitations for civil actions based on sexual assault in 2020. *See* H.B. 705-FN, as amended, *An Act Relative to Sexual Assault, Sexual Misconduct in Institutions of Higher Education, and the Rights of Victims of Crimes* (2020) (enacted), § 11 (amending RSA 508:4-g to allow sexual assault victims to commence a personal action "at any time").

41. As an adult, Plaintiff began the process of inquiry, investigation, and exercise of reasonable diligence into how persons in positions of authority within Defendant's organization could have and should have known about the abuse and the inherent and foreseeable risks of child abuse and yet failed to take steps to protect Plaintiff.

42. Following this period of inquiry, investigation, and exercise of reasonable diligence, Plaintiff discovered that, in fact, the acts and omissions of Defendant caused or contributed to the abuse Plaintiff endured as a child and continues to suffer from to this day. Thereupon, Plaintiff initially attempted to pursue resolution of his claims through the New Hampshire Youth Development Center Claims Administration and Settlement Fund (the "Settlement Fund"), created pursuant to RSA 21-M:11-a. However, after filing a claim in the Settlement Fund in 2023, Plaintiff discovered that his claims arising from placement at Defendant's facility were not eligible for resolution in the Settlement Fund. Consequently, Plaintiff withdrew his Settlement Fund claim in 2024, and Plaintiff and the State of New Hampshire entered

14

into a settlement agreement, pursuant to which Plaintiff granted the State a full release and discharge of all claims he might have pursued against the State with respect to his placement at Orion House. Plaintiff thereafter commenced a civil action against Defendant in New Hampshire Superior Court on March 28, 2025.

43.    Shortly after filing his original lawsuit against Orion House, Plaintiff relocated to Massachusetts to live with a family member indefinitely. Plaintiff continues to reside in Massachusetts. Plaintiff moved to voluntarily non-suit his original lawsuit against Defendant without prejudice on June 17, 2025, which motion was granted. *Caleb Lapierre v. Orion House, Inc.*, No. 218-2025-CV-00424 (N.H. Super. Ct. July 10, 2025). Pursuant to New Hampshire's "savings statute," RSA 508:10, Plaintiff is entitled to file a new lawsuit within one year of the dismissal of his original lawsuit without prejudice, which Plaintiff now does through the present action. Because Plaintiff's present action meets the requirements for diversity jurisdiction, Plaintiff now pursues his claims against Orion House in this Court.

## CAUSES OF ACTION

### COUNT I
**(Breach of Nondelegable Fiduciary Duty)**

44.    Plaintiff hereby repeats, realleges, and incorporates by reference each and every factual allegation set forth in this Complaint as though fully and completely set forth herein.

45.    Pursuant to the State's *parens patriae* powers, including those set forth in the Child Welfare Acts and their antecedents, the State of New Hampshire took custody and control of Plaintiff as a child and placed Plaintiff at the congregate care facility operated by Defendant.

46.    At all times relevant to the allegations contained herein, Defendant was a privately owned business that contracted with and was licensed and paid by the State of New Hampshire to provide programs and services on behalf of the State and as an agent of the State to children in the

15

custody and control of the State. In particular, the State of New Hampshire retained and licensed Defendant to provide a congregate care residential facility, Orion House, for children in state custody, including Plaintiff.

47.    The Child Welfare Acts and their antecedents impose statutory duties upon the State with respect to all minors committed to the State's custody and control. As an agent of the State who contracted with and was licensed by the State to provide programs and services on behalf of the State to children in the custody and control of the State, Defendant accepted responsibility for performing and fulfilling the State's statutory obligations under the Child Welfare Acts and their antecedents with respect to all children in state custody whom the State placed at Orion House and entrusted to the custody, care, and control of Defendant and its agents and employees.

48.    When the State of New Hampshire removed Plaintiff from the custody, care, and control of his parents and placed Plaintiff with Defendant, and Defendant accepted physical custody of Plaintiff pursuant to its contract with the State, and Defendant thereafter exercised physical control over Plaintiff to the exclusion of others, Defendant accepted a fiduciary obligation to protect and care for Plaintiff. Thereafter, Defendant was required by common law to act at all times in Plaintiff's best interests, including by taking whatever steps necessary to prevent Plaintiff from being harmed. *See Schneider v. Plymouth State College*, 144 N.H. 458, 463 (1999) (holding that when plaintiff college student enrolled at defendant college, "she became dependent on [defendant college] for her education, thereby . . . giv[ing] rise to a fiduciary duty on behalf of [defendant college] to create an environment in which the plaintiff could pursue her education free from sexual harassment by faculty members"). As a result, Defendant was "bound to act in good faith and with due regard to the interest of" Plaintiff at all times. *Id.* at 462 (internal quotation omitted).

16

49.    Moreover, by operating a residential child care facility licensed by the State of New Hampshire, Defendant accepted duties to Plaintiff and all other minors in its care pursuant to RSA Chapters 126-U and 170-E, and N.H. Code R. Chapter He-C 4000, Part He-C 4001. Among other duties, Defendant was prohibited by RSA 170-E:27, II from caring for any child entrusted to its care in a manner which would endanger the health, safety, or welfare of the child and from negligently violating a duty of care or protection owed to a child in its care. Defendant's employees and agents were also required to "provide care and supervision at all times to ensure that residents are safe and that their needs are met according to their developmental level, age, emotional or behavioral needs." N.H. Code R. He-C 4001.14(a).

50.    The fiduciary duty and related duties Defendant owed to Plaintiff were nondelegable. As such, the Defendant is directly liable for all breaches of its duties to Plaintiff.

51.    Notwithstanding the nondelegable and fiduciary duties Defendant owed to Plaintiff, during the time that Plaintiff was placed at Orion House, agents and employees of Defendant harmed Plaintiff by the specific acts of child abuse recounted in the above factual allegations. Moreover, each agent and employee of Defendant had an independent duty to report knowledge of events observed, heard about, or done by the agent or employee relating to the care and safety of children in state custody placed with Defendant. On information and belief, however, the agents and employees of Defendant working at Orion House failed to report or take corrective steps after witnessing or becoming aware of the abuse of Plaintiff and the abuse of other children at the facility, both before and during the time that Plaintiff was a resident at Orion House, and/or agents and employees in supervisory positions failed to take adequate corrective action upon receiving such reports, and thereby failed to correct the conditions that led to Plaintiff's subsequent abuse.

52.     Each of the acts of child abuse recounted in the above factual allegations constitutes an independent and completed breach of Defendant's nondelegable and fiduciary duties to Plaintiff, and the repeated failures of the agents and employees of Defendant to take corrective action in response to Plaintiff's abuse, and to take corrective action in response to previous or concurrent acts of abuse against other children, represent additional breaches by agents and employees of Defendant, all of which are imputable to Defendant. Even setting aside the failure to take corrective action in response to actual incidents of abuse, Defendant knew or should have known of the inherent risks of abuse to children in congregate care facilities by the adults charged with their care and breached its nondelegable and fiduciary duties to Plaintiff by failing to take affirmative action to prevent or correct the conditions that led to Plaintiff's abuse.

53.     Defendant's breach of its nondelegable and fiduciary obligations to Plaintiff was the direct and proximate cause of the harm Plaintiff suffered while residing in the Defendant's facility as recounted above, and Plaintiff sustained substantial personal injuries of a disabling, debilitating, and permanent nature, severe and prolonged pain and suffering, medical expenses, permanent impairment, loss of enjoyment of life, severe and permanent mental and emotional distress, and lost income and earning capacity, and will be caused to suffer all of the foregoing losses and damages into the foreseeable future.

## COUNT II
### (Negligent Hiring, Training, Supervision, and Retention)

54.     Plaintiff hereby repeats, realleges, and incorporates by reference each and every factual allegation set forth in this Complaint as though fully and completely set forth herein.

55.     At all times relevant to the allegations contained herein, Defendant owed Plaintiff a duty to exercise reasonable care in the hiring, training, supervision, and retention of its employees and agents, including, *inter alia,* the duty to properly supervise, train, and control the employees

18

and agents working with minors at its residential facility, and to ensure that programs were in place to provide proper hiring, training, supervision, and retention so that its agents and employees would comply with the protective and rehabilitative duties owed to children in state custody, as required by common law, RSA Chapters 126-U, 169-B, 169-C, 169-D, and 170-E, and N.H. Code R. Chapter 4000, Part He-C 4001.

56.     Despite and in breach of the aforesaid duties, Defendant, as an organization charged under the common law and by statute with the rehabilitation and protection of minors in state custody, was negligent and breached minimum standards of care in failing to take reasonable measures to ensure the proper hiring, training, supervision, and retention of its agents and employees to promptly and effectively provide for the safety and welfare of the children in in its care. Defendant's negligence includes, but is not limited to, failing to take reasonable measures to properly hire, train, supervise, and retain its workers, failing to report and act on any indicia or precursors of suspected physical, sexual, or emotional abuse, and failing to take affirmative steps to prevent the physical, sexual, and emotional abuse, including the excessive use of restraints and excessive use of force, thereby resulting in the abuse experienced by Plaintiff.

57.     Upon information and belief, multiple employees and agents of Defendant, including those in supervisory positions, knew or reasonably should have known of the indicia of abuse and the abusive proclivities of certain employees or agents of Defendant, and knew or reasonably should have known of the foreseeable risk of harm to Plaintiff and other children in Defendant's custody, care, and control. Notwithstanding this actual or constructive knowledge, agents and employees of Defendant not only failed to report this information and/or failed to take adequate corrective action in response to this information, but also actively concealed this information, which resulted in the continued retention of the individual perpetrators as employees or

19

agents of Defendant, and the continued perpetration of abuse upon Plaintiff and other children in the State's custody, care, and control. More than that, agents and employees of Defendant, including those in supervisory positions, tolerated or ignored a general culture of violence, abuse, boundary crossing, and disrespect and antipathy toward the children in their custody, creating fertile ground for reasonably foreseeable individual acts of abuse to proliferate, persist, and be left unaddressed, thereby creating a cycle that perpetuated abuse.

58.     On further information and belief, when reports of suspected child abuse were made, employees and agents of Defendant, including those in supervisory positions, told the reporters to keep the reports to themselves or otherwise discouraged or prevented reporting of the abuse; consequently, no corrective action was taken, and the perpetrators of abuse continued in their employment as agents and employees of Defendant.

59.     Additionally, notwithstanding Defendant's knowledge of prior abuse of children in its custody and the foreseeable risk of future harm to children who remained in its custody, including Plaintiff, Defendant failed to adequately supervise and train its agents and employees who were entrusted to care for and protect children in its custody.

60.     Defendant's negligent hiring, training, and supervision of its agents and employees was the direct and proximate cause of the harm Plaintiff suffered while residing in the Defendant's facility as recounted above, and Plaintiff sustained substantial personal injuries of a disabling, debilitating, and permanent nature, severe and prolonged pain and suffering, medical expenses, permanent impairment, loss of enjoyment of life, severe and permanent mental and emotional distress, and lost income and earning capacity, and will be caused to suffer all of the foregoing losses and damages into the foreseeable future.

## COUNT III
### (Negligence)

61.     Plaintiff hereby repeats, realleges, and incorporates by reference each and every factual allegation set forth in this Complaint as though fully and completely set forth herein.

62.     By taking custody and control of Plaintiff, a minor, and by accepting the obligation to care for and protect Plaintiff in place of Plaintiff's parents, family, or legal guardian, from whom the State physically separated Plaintiff and who the State effectively barred from ensuring Plaintiff's care and protection, Defendant entered into a special relationship with Plaintiff.

63.     The special relationship between Defendant and Plaintiff created a duty of care owed to Plaintiff, including, but not limited to, a duty of reasonable supervision and a duty to protect Plaintiff from reasonably foreseeable harm.

64.     Defendant and its agents and employees also owed Plaintiff duties arising under statutory law, including, but not limited to, the duties set forth in the Child Welfare Acts, the duties set forth in RSA Chapter 126-U, and the duty to report instances of suspected child abuse or neglect pursuant to RSA 169-C:29.

65.     During the time period that Plaintiff was committed to the custody, care, and control of Defendant and resided in the residential facility operated by Defendant, agents and employees of Defendant harmed Plaintiff by the specific acts of child abuse recounted in the above factual allegations. Moreover, the agents and employees of Defendant working at Orion House, including those in supervisory positions, failed to report or take corrective steps that could have prevented the abuse suffered by Plaintiff, despite actual or constructive knowledge of prior abuse of other children in state custody at the facility operated by Defendant.

66.     The harm Plaintiff suffered was reasonably foreseeable and preventable. Upon information and belief, agents and employees of Defendant, including those in supervisory positions,

21

knew or reasonably should have known of at least some of the various forms of abuse and harm suffered by minors placed in the custody and control of Defendant, including Plaintiff, and not only failed to report this information or to take adequate corrective action in response to this information, but actively participated in the abuse and/or concealed this information and thereby failed to correct the conditions that led to Plaintiff's subsequent abuse. Even setting aside the failure to take corrective action in response to actual incidents of abuse, Defendant knew or should have known of the inherent risks of abuse to children in congregate care facilities by the adults charged with their care and breached its special duties to Plaintiff by failing to take affirmative action to correct the conditions that led to Plaintiff's abuse. More than that, Defendant, including agents and employees in supervisory positions, tolerated or ignored a general culture of violence, abuse, boundary crossing, and disrespect and antipathy toward the children in Defendant's custody, creating fertile ground for reasonably foreseeable individual acts of abuse to proliferate, persist, and be left unaddressed, thereby creating a cycle that perpetuated abuse. All of the aforesaid knowledge, constructive knowledge, acts, and omissions of agents and employees of Defendant are imputable to Defendant.

67.    Inasmuch as the harm suffered by Plaintiff was reasonably foreseeable and preventable, Defendant breached its duties owed to Plaintiff. Moreover, Defendant also breached statutory duties owed to Plaintiff, including, but not limited to, the duty to report suspected instances of child abuse or neglect.

68.    Defendant's negligence, including negligent supervision, negligent failure to protect, and negligent failure to report instances of child abuse or neglect, was the direct and proximate cause of the harm Plaintiff suffered while residing in the Defendant's facility as recounted above, and Plaintiff sustained substantial personal injuries of a disabling, debilitating, and permanent nature, severe and prolonged pain and suffering, medical expenses, permanent

impairment, loss of enjoyment of life, severe and permanent mental and emotional distress, and lost income and earning capacity, and will be caused to suffer all of the foregoing losses and damages into the foreseeable future.

## COUNT IV
### (Assault and Battery – Vicarious Liability)

69.     Plaintiff hereby repeats, realleges, and incorporates by reference each and every factual allegation set forth in this Complaint as though fully and completely set forth herein.

70.     As recounted herein, after the State took custody of Plaintiff and placed him at Defendant's congregate care facility, employees and agents of Defendant physically and sexually assaulted and battered Plaintiff. That is to say, employees and agents of Defendant acted with the intention of causing non-privileged harmful or offensive contact with Plaintiff, or with the intention of causing imminent apprehension of such contact, or with knowledge that such a result would, to a substantial certainty, be produced by their acts, and Plaintiff was thereby put in such imminent apprehension of such non-privileged offensive contact or such non-privileged offensive contact did in fact result.

71.     Each of the herein alleged assaults and batteries were conducted within the scope of the perpetrators' employment, and, accordingly, Defendant is liable for the assaults and batteries of its employees and agents under the doctrine *respondeat superior*.

72.     Defendant is additionally or alternatively liable for the assaults and batteries of its employees and agents because its employees and agents acted or commanded Plaintiff to act on behalf of Defendant, and Plaintiff relied upon their apparent authority in acceding to their assaults and batteries; and/or because Defendant's employees and agents were aided in accomplishing their assaults and batteries by the existence of their agency relationship with Defendant.

73.     As a direct, proximate, and reasonably foreseeable result of the foregoing assaults and batteries, Plaintiff suffered harm. As recounted above, Plaintiff sustained substantial personal injuries of a disabling, debilitating, and permanent nature, severe and prolonged pain and suffering, medical expenses, permanent impairment, loss of enjoyment of life, severe permanent mental and emotional distress, and lost income and earning capacity, and will be caused to sustain all of the foregoing losses and damages into the foreseeable future.

WHEREFORE, Plaintiff seeks the following relief:

A.     Entry of judgment in Plaintiff's favor on each and every count of this Complaint;

B.     Award of all actual damages, economic damages, emotional distress and mental anguish damages, and compensatory damages, including enhanced compensatory damages, to which Plaintiff is entitled, plus recoupment of reasonable attorneys' fees, expert fees, other costs, and interest, all in an amount to be determined at the time of trial but in excess of $75,000;

C.     Award of pre- and post-judgment interest; and

D.     All such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

* * *

Respectfully submitted,

**CALEB LAPIERRE**

Dated: March 23, 2026                    By and through counsel,

**NIXON PEABODY LLP**

*/s/ David A. Vicinanzo*
David A. Vicinanzo, Esq. (Bar No. 9403)
Nathan P. Warecki, Esq. (Bar No. 20503)
Andrew J. Newcombe, Esq. (Bar No. 277606)

900 Elm Street, 14th Floor
Manchester, NH 03101
T: (603) 628-4000
F: (603) 628-4040
dvicinanzo@nixonpeabody.com
nwarecki@nixonnpeabody.com
anewcombe@nixonpeabody.com